DIERKS LUMBER & COAL COMPANY *v.* COFFMAN.

Opinion delivered November 21, 1910.

1. FRAUDS, STATUTE OF—WAIVER.—The statute of frauds cannot be availed of unless it was pleaded in the court below. (Page 510.)

2. AGENCY—HOW PROVED.—While the transactions and declarations of an agent are inadmissible to prove his agency as against his principal, the agent may testify that he is agent of the principal. (Page 510.)

3. SAME—UNAUTHORIZED ACT—RATIFICATION.—There is a distinction where a principal is notified of the unauthorized act of an agent and of a mere volunteer in this, that the principal's silence in the first instance will be deemed a ratification, while it will not be such in the second. (Page 510.)

Appeal from Howard Circuit Court; *James S. Steel,* Judge; affirmed.

*Sain & Sain* and *J. S. Kirkpatrick,* for appellant.

The agency of Campbell could not be established by proof of statements made by him to the effect that he was such agent. 31 Ark. 212; 33 Ark. 251.

*W. C. Rodgers,* for appellees.

1. It is undisputed that the supplies were furnished; that those furnished on the May payroll were sent to DeQueen, and were paid; that Mr. Dierks made no objection to the orders in dispute except that the two mills were "in the hole," and that amounts of these orders were deducted in the settlement between appellant and the hands.

There is no better way to interpret a contract than by the acts of the parties under it, and appellant, under these facts will not be heard to deny its liability. 46 Ark. 129; 52 Ark. 65; 55 Ark. 414; 78 Ark. 202; *Id.* 418; 80 Ark. 543; 130 S. W. (Ark.) 452; 91 Ark. 350.

2. Proof of Campbell's agency does not depend on his declarations. There is other evidence in the record of such agency. Moreover, there is no assignment in the motion for new trial of error in the manner of proving his agency. 23 Ark. 19; 91 Ark. 427; *Id.* 441; 73 Ark. 530; 77 Ark. 27; *Id.* 418; 67 Ark. 531; 70 Ark. 337; *Id.* 427.

The testimony tends to show that what he said appellant would do was done, and to establish the course of dealing contended for by appellees.

3. Appellant cannot avail itself of the statute of frauds by raising the question here for the first time. This statute cannot be relied on unless pleaded in the answer. 71 Ark. 302; 46 Ark. 96; 70 Ark. 558; 87 Ark. 443; 70 Ark. 558; 80 Ark. 391; 81 Ark. 476; 82 Ark. 260; 83 Ark. 574; 79 Ark. 53; 90 Ark. 469; 74 Ark. 72; 90 Ark. 531.

HART, J. This is an appeal by the Dierks Lumber & Coal Company, a corporation, from a judgment rendered against it in the Howard Circuit Court for $281.07 in favor of Coffman Brothers, a partnership, composed of J. H. Coffman, D. D. Coffman and T. J. Coffman. The facts are substantially as follows:

Appellant owned a great quantity of timber situated in the northern part of Howard County. Appellant and one James Graves entered into a written contract whereby the latter agreed to erect a saw mill on the lands of the former, and saw its timber into lumber. The price to be paid for the sawing was fixed by the contract. Appellant was designated in the contract as the party of the first part, and James Graves as the party of the second part. Among other provisions, the contract contained the following:

"The party of the first part reserves the right to pay direct to all employees of the party of the second part who would be entitled to a lien on said lumber under the laws of the State of Arkansas all that may be due such employees, the balance to be paid direct to the party of the second part on or before the 10th day of the month following such grading, stacking and counting."

J. H. Coffman, one of the appellees, testified that his firm owned and operated a supply store at New Hope near the sites of said mills. That J. M. Campbell and H. L. McGehee stayed all night with him, and he asked them about letting the mill hands have supplies. McGehee was foreman at Moore's mill, and Coffman, in response to a question by the court as to whom Campbell was representing, answered that he was representing the appellant. Coffman further said: "He (Campbell) told me that they were responsible—that the Dierks people were responsible for all of the labor that was done at the mills, and I told him very well, or something of that kind, and went ahead, and when the foreman issued an order to the hands for the time, why we took these orders, and let them have goods, and turned the orders in to the office at De Queen, for the May payroll of 1908, I believe, to the best of my recollection, and they paid for all of the orders."

The May orders went into the office of appellant, and were promptly paid by it. The appellees then furnished supplies on

the June orders or time checks issued by the mill foreman, and these in turn were sent in to the appellant for payment, and payment was refused. The amount due on these orders is $281, and represents the same kind of transaction as occurred on the supplies furnished in May.

The following is quoted from the testimony of J. H. Coffman:

"Q. Now, who did you contract with? A. As I told you a while ago, I spoke to Mr. Campbell there, and asked him about this matter. I seen how it was coming up, and he says we are responsible for all the time—we pay the labor of the hands, whether the mill man cuts anything or not, and that was about all. That was the most I recollect. Q. Mr. Campbell is with the Dierks Lumber Company, isn't he? A. Yes, sir. Q. Whom did you look to for payment? A. I look to the Dierks people. Q. Whose timber was it that they were sawing up, Mr. Coffman? They were sawing the timber of the Dierks Lumber and Coal Company, were they not? A. Yes, sir. Q. And these hands that were furnished supplies to were hands working at the mills of the defendant? A. Yes, sir."

H. L. McGehee testified as follows:

"Q. Do you know where the Moore mill was? That's in Howard County? A. Yes, sir. Q. What connection did you have with it? A. I was foreman. Q. Did you write any orders for the hands of that mill? A. Yes, sir. Q. To the defendants? A. Yes, sir; some to them. Q. Have the Dierks people sent you the money to pay Coffman? A. Yes, sir. Q. Now, Mr. McGehee, whose lumber were the Dierks people getting up there? A. Dierks'. Q. Where did that lumber go after it was cut? A. It went from there to Dierks—supposed to go there—but some is there yet, I think. Q. Was it more convenient to get supplies for the hands up there at New Hope or at Dierks? A. It was more convenient at New Hope. Q. Did Mr. Campbell say anything to you about furnishing these supplies at the time you took charge of the Moore mill? A. Why, all Mr. Campbell said to me was he instructed me not to give orders for any more time than the men had coming. Q. That had reference to the time for supplies? A. Yes, sir. Q. And of course you did not do so? A. No, sir.

Q.  Mr. McGehee, do you know whether or not, in settling up with these men for their time, these orders for supplies were deducted out of their time? A. Yes, sir."

Owen Phillips and J. J. Coffman testified that they worked at the Moore mill, and that they bought supplies from appellees during this time; that McGehee would give them an order for the amount of time they had worked, and the amount due therefor, and they would take it and buy supplies from appellees with it; that in settling with them McGehee would only pay them for what was left after deducting these orders which had been given them with which to trade with appellees.

Will Wilson testified as follows in regard to the agency of Campbell:

"Q.  Do you know Mr. Campbell? A. Yes, sir. Q. What connection has he with the Dierks people? A. He has been working for them quite a while in our country as agent. Q. Was he working there in 1908? A. Yes, sir."

J. H. Coffman, being recalled, again stated that, in talking with Campbell about the mill hands getting supplies from his firm, Campbell said they (meaning appellant) would be responsible for all the time the hands had coming. He further stated that, upon the refusal of appellant to pay the June orders, he went to see Herman Dierks, the head man of the company, and that Dierks told him that the reason that they had not paid appellees was that "the mills had gone in the hole." That he did not say anything about the authority of the mill people to issue the time checks.

J. M. Campbell testified that he was working for the Choctaw Lumber Company. He denied that he had any conversation with Coffman about supplying the mill hands. He stated that he and Graves were the only persons present when the contract with him was made, and that the Moore contract was similar to that of Graves.

It is apparent that appellant is liable if Campbell had authority to make the contract which is the basis of this suit. While Campbell denies having made a contract with appellees that appellant would be responsible for or pay for the supplies furnished the mill hands to the amount of wages of the hands, Coffman testifies positively that such contract was made, and

the jury has settled the disputed question of fact in favor of appellees, and the verdict is conclusive upon us.

It is first contended by counsel for appellant that appellee's claim is within the statute of frauds; but, even if that defense could have availed appellant, it was not made in the trial court, and the statute of frauds can not be availed of unless pleaded. *St. Louis, I. M. & S. Ry. Co.* v. *Hall,* 71 Ark. 302.

It is next contended by them that Campbell had no authority to make such contract, and this is the most serious question in the case.

While it is the settled law, as contended by counsel for appellant, that the transactions and declarations of an agent are not of themselves evidence of his agency as against the principal, the agent may testify as to the fact that he is the agent of the principal, just as he may testify about any other fact of which he has affirmative knowledge. It is true that Campbell testified that at the date of the trial he was employed by the Choctaw Lumber Company; but he also stated that he and Graves were the only persons present when the contract was made with the latter to erect the mill and manufacture the timber of the former into lumber; and that the contract of appellant with Moore was similar to that made with Graves. From this the jury might have inferred that he acted as the agent of appellant in making these contracts.

It is shown by other independent evidence that Campbell was the agent of appellant during the whole period of time covered by the transactions in question. While the evidence does not establish the fact that he had authority to make the contract in question in this case, it does show that he had been representing the appellant for several years, and had performed numerous services for it as agent; and was acting as its agent during the period of time covered by the transactions involved in this suit.

As we have already seen, there was sufficient testimony to show that he did make the contract in question, and the jury by its verdict so found. This brings us to the question of whether his action in making the contract was ratified by the principal.

"In considering whether the facts and circumstances of a particular case are sufficient evidence of a ratification, the dis-

tinction has been made between the unauthorized act of an agent where the relation of principal and agent already exists, and that of a mere volunteer or stranger. In the former case, it is said that an intention to ratify will always be presumed from the silence of the principal after being informed of what has been done on his account, while in the latter case it has been said there exists no obligation to repudiate the transaction, nor will silence be construed into a ratification." *Heyn* v. *O'Hagen,* 60 Mich. 150. See also Story on Agency, § § 255, 258; *Gold Mining Co.* v. *National Bank,* 96 U. S. 640; Clark & Skyles on the Law of Agency, § § 110 and 136.

It will be noted that appellant in its contract with Moore and Graves reserved the right to pay direct all the mill employees, and that for the month of May it elected to do so. At the end of the month the foreman at the mills sent in to the office of appellant a statement of the time worked by each man and the amount due him, and from this statement of the total amount due was deducted the amount of the time checks which had been given the employees during the course of the month, and which had been used by them in purchasing supplies from appellees. The balance due the employees as shown by this statement was sent to the foreman and by him paid to the employees.

The amount of the time orders used by the employees in buying goods from appellees were sent by appellees to the office of appellant, and was promptly paid by it. From these circumstances it might be inferred that appellant had knowledge that some of its agents had made arrangements with appellees to furnish supplies to the mill employees on these time checks or orders and to send them in to appellant to be paid. Otherwise why should they have been presented to appellant for payment? These facts and circumstances operate as presumptive proof that appellant had knowledge of what had been done on its account, and that some of its agents were assuming to act for it in the matter. Appellant knew that its silence and failure to repudiate the acts of its assumed agents would be likely to cause injury to appellees as persons giving credit to the mill employees and to induce them to believe that appellant's agents, assuming to act for it in the matter, had authority to do so. Hence we conclude that there is sufficient evidence to support the verdict.

While complaint is made of the instruction given by the court upon this theory of the case, we believe that the court in the instruction complained of had in view the law as we have declared it, and that the instruction was not erroneous. Its language might have been couched in plainer terms, but this defect was one of form, and not of substance, and should have been met by specific objection.

The judgment will be affirmed.